## BARRONS v. UNITED STATES et al.
### No. 12794.

United States Court of Appeals
Ninth Circuit.

July 23, 1951.

Gordon W. Mallatratt, San Francisco, Cal., for appellant.

Oran W. Palmer and Johnston, Baker & Palmer, all of Bakersfield, Cal., for appellee.

Before BONE, ORR and POPE, Circuit Judges.

ORR, Circuit Judge.

The formality of a proxy marriage was entered into by appellee, June Alger Barrons (also known as June Alger Goodwin) with Lieutenant William J. Barrons, on the 20th day of July 1944 in the city of Reno, State of Nevada. On July 27, 1944 Lieutenant Barrons was killed in action. Prior to his death the deceased had changed the beneficiary of a National Service Life Insurance policy held by him to June Alger Barrons, designating her as his wife. Appellee received payments of the proceeds from the policy until 1948. The payments were then suspended because the right thereto of appellee was challenged by appellant, the father of the deceased.

This action, in the nature of an interpleader,[1] was instituted in the District Court by

1. 38 U.S.C.A. § 817.

the United States for the purpose of having a judicial determination as to which of the claimants is entitled to the proceeds of the policy.

Appellee qualifies as a beneficiary only if she is the "widow" of the late William J. Barrons within the meaning of 38 U.S.C.A. § 802(g).[2] Her claim rests upon the validity of the proxy marriage performed in Nevada. The facts appear in detail in the opinion of the District Court reported in 91 F.Supp. 319. Here, it need be said only that subsequent to the departure of deceased overseas in April 1944 he learned that appellee was pregnant. Upon learning of appellee's condition Lieutenant Barrons took immediate steps to do all within his power to rectify the situation in which the young people found themselves. He secured the help of the Red Cross. That agency arranged for a proxy marriage to be performed and, doubtless being informed that marriage by proxy was legal in Nevada, arranged to have the ceremony performed in that state. The various requirements of the Nevada marriage laws were complied with, a proxy ceremony was duly celebrated before a regularly ordained minister authorized by law to perform ceremonies, appellee being personally present and Lieutenant Barrons being represented by a person designated by the Red Cross. Lieutenant Barrons lived but one week after the ceremony.

### 1. Choice of Law.

The regulations promulgated by the Administrator under the National Service Life Insurance Act provide that the validity of the marriage shall be determined " 'according to the law of the place where the parties resided at the time of marriage, or at the time and place where the parties resided when rights to compensation or pension accrued.' "[3] At the time of the ceremony the parties to the marriage were subject to military orders, one stationed in California and the other in Africa. In civilian life appellee had maintained her residence in Texas and the deceased in California. There is some dispute as to whether (and

if so, when) appellee changed her residence to California.

The controlling law must be either that of California or that of Texas. The relevant law of those states is identical and it is therefore unnecessary to choose between them.

### 2. The Relevant Law.

Appellant asserts that the regulation quoted above requires that the marriage be considered invalid for purposes of National Service Life Insurance if it was not *authorized* by the laws of the state of residence, even though its validity would be *recognized* in the state of residence; that is to say, the validity of the marriage must be determined by reference only to the marriage law, not to the conflicts law, of the state of residence. The vice of this contention is made apparent when the possible results are contemplated. Few, if any, marriages celebrated outside the state of residence would comply with all the formal requirements of the laws of the state of residence relating to such matters as the essential recitals of the marriage certificate, authorization to issue the license and perform the ceremony, and similar details. While all such marriages, if valid where celebrated, would be recognized as valid in all states for all other purposes, on appellant's theory they would be considered invalid for purposes of National Service Life Insurance.

Conversely, a marriage invalid where celebrated might be deemed to satisfy the essential requirements of the marriage law of the state of residence. Such a marriage would be invalid in all states for all other purposes, but on appellant's theory would be valid for purposes of the National Service Life Insurance. To carry this hypothesis one step further, the supposed husband, as a party to such an invalid marriage might subsequently contract a valid marriage with another woman in the state of residence, thus leaving on his death two "widows" within the meaning of 38 U.S.C.A. § 802 (g). Appellant suggests no rational method

---

2. See United States v. Snyder, 1949, 85 U. S.App.D.C. 198, 177 F.2d 44, 46, 47.

3. 38 Code Fed.Regs. § 8.53 and § 3.49 (a) (1949 ed.). See United States v. Snyder,

1949, 85 U.S.App.D.C. 198, 177 F.2d 44, supra, note 2, for background of these regulations and their applicability to the National Service Life Insurance.

for allocating the proceeds between the two. An intent to bring about these results cannot reasonably be inferred from the statute or the regulations.

■ It is true that the Veterans Administration at one time provided that the validity of a marriage should be determined in accordance with the law of the place of the ceremony.[4] That provision was manifestly unsatisfactory, for it would recognize as valid[5] a marriage celebrated elsewhere which conflicted with the explicit policy of the state of residence (and perhaps of all other states), and which therefore might not be recognized there for any purpose. It is not surprising that this provision was short-lived. The prompt elimination of said provision does not indicate a purpose to achieve the results which would follow upon appellant's interpretation, but rather indicates a purpose to recognize as the "widow" for insurance purposes that person who was recognized as validly married to the deceased at the time of his death, under the general law of the state of residence. The relevant law to which the regulations refer is the general law of the state of residence, including the conflicts law.

3. The Law of Texas and California.

■ A marriage is generally recognized as valid in any state if it was valid in the state where it was celebrated, at least unless it collides with some strong public policy of the state of residence.[6] This rule is followed in both California[7] and Texas.[8] Appellee's proxy marriage would therefore be recognized as valid in either state if it was validly celebrated under the marriage laws of Nevada, at least unless proxy marriages are strongly in conflict with some affirmative policy of California or Texas.

■ No California or Texas case relating to the validity of a proxy marriage in another state has been called to our attention. However, it is clear there exists no strong policy in either state opposed to such marriages. The marriage relationship validly created by a proxy ceremony is in no way different from the same relationship created in the more usual manner;[9] there is no aspect of the relationship comparable to marriages deemed bigamous or incestuous by the law of the state of residence. A persuasive indication of the absence in Anglo-American jurisdictions of a strong objection to the principle of proxy marriages is the fact that in some states, at least, and perhaps in Texas,[10] such marriages have been authorized under the local marriage laws, as hereinafter discussed. All states which have passed upon the question have recognized the validity of

---

4. See United States v. Snyder, supra, note 2, 85 U.S.App.D.C. 198, 177 F.2d 44, 47.

5. According to the Restatement, this problem could not arise, because the paramount interest of the domiciliary state would render the marriage invalid even in the state where it was celebrated, and therefore invalid under the regulation referred to. Restatement, Conflict of Laws, § 132 (1934). However, it is not clear that the Restatement is uniformly, or even generally, followed on this point. See Stumberg, Conflict of Laws, 288–92 2d ed. 1951).

6. There appears to be no disagreement on this proposition.
See, e.g., 2 Beale, Conflict of Laws, §§ 121.2–121.7 (1935 ed.); Stumberg, Conflict of Laws, 281–82 (2d ed. 1951); Goodrich, Conflict of Laws, § 116 (3d ed. 1949); Restatement, Conflict of Laws, § 121 (1934).

7. Cal.Civ.Code, § 63. Deering, 1949: "All marriages contracted without this state, which would be valid by the laws of the country in which the same were contracted are valid in this state"; McDonald v. McDonald, 1936, 6 Cal.2d 457, 459, 58 P.2d 163, 104 A.L.R. 1290.

8. Portwood v. Portwood, Tex.Civ.App. 1937, 109 S.W.2d 515, 522; See Speer, Marital Rights in Texas, § 27 (1916).

9. It has been frequently pointed out that the proxy aspect of the celebration is merely a matter of form. See Apt (otherwise Magnus) v. Apt, P.D.A.1947, 176 L.T. (n.s.) 359, noted in 1947 Weekly Notes at 123; Lorenzen, Marriage by Proxy and the Conflict of Laws, 1919, 32 Harv.L.Rev. 473, 483; Stumberg, Conflict of Laws 283 (2 ed. 1951).

10. See Annotation, 170 A.L.R. 947, 949, citing Opinion No. O–7529 of the Opinions of the Attorney General of Texas, 1946.

proxy marriages validly performed elsewhere.[11] We conclude that both California and Texas would recognize this marriage, if it was validly celebrated in Nevada.

### 4. The Validity of Proxy Marriages in Nevada.

█ Our problem is therefore reduced to the question of whether a proxy marriage is valid under the laws of Nevada. Prior to 1943 this marriage might well have been upheld as a common law marriage, common law marriages having been recognized in Nevada until that date.[12] Shortly before the instant ceremony was performed in 1944 the Nevada legislature amended the marriage laws to abolish the ancient doctrine of the common law marriage.[13] Hence, this marriage can be upheld, if at all, only as a ceremonial marriage.

█ The 1943 amendment to the Nevada marriage laws provided, in part: "Consent alone will not constitute marriage; it must be followed by solemnization as authorized and provided by this act * * *." Accordingly, no ceremonial marriage can be deemed valid unless it has been solemnized in compliance with the requirements of § 4054 of the Nevada statutes, which provides that "the *parties shall declare,* in the presence of the judge, minister, or magistrate, and the attending witnesses, that they take each other as husband and wife; and in every case there shall be at least two witnesses present * * *." [14] [Emphasis added] Superficially, the statute could be construed to require that the declaration be made by the parties personally,

and that a proxy marriage is therefore invalid.[15]

That construction is not required, however. The statute does not clearly preclude the possibility of making the requisite declaration through an authorized agent, designated for that purpose. While it is true that many marital duties are of a highly personal nature and could not properly be delegated,[16] that proposition does not determine whether the particular duty of expressing consent in the presence of an authorized official can properly be delegated.[17] Since the Nevada statutes are not explicit on the point, the precise question is whether the performance of this particular duty by proxy would be consistent with the Nevada marriage laws in general and, in particular, with the requirement of formal solemnization.

█ The two principal objectives of the requirement of formal solemnization, apparently, are to insure the public interests in publicity and certainty. Both these objectives are achieved as well in the case of a proxy ceremony as in the usual type of ceremony.

Since "no particular form shall be required," [18] it seems doubtful that the requirement of solemnization was intended to constitute a substantial factor in insuring that the parties personally will be fully cognizant of the importance and solemnity of the occasion. In any event, that interest appears to be adequately protected by the other formalities prerequisite to the ceremony.

11. The numerous cases on this point are discussed or cited in 2 Beale, Conflict of Laws § 124.1 (1935 ed.); Stumberg, Conflict of Laws 283 (2d ed. 1951); Goodrich, Conflict of Laws § 116 (3d ed. 1949); Howery, Marriage by Proxy and Other Informal Marriages, 1944, 13 U. of K.C.L.Rev. 48, 59–61; Annotation, 170 A.L.R. 947, 949–52 (1947). See also, Lorenzen, op. cit. supra, note 9; Restatement, Conflict of Laws, § 124 (1934); 33 Cornell L.Q. 129 (1947).

12. Clark v. Clark, 1920, 44 Nev. 44, 189 P. 676, 194 P. 96.

13. Statutes of Nevada, 1943, c. 190, p. 279, Nevada Compiled Laws, § 4050, Bender-Moss, Supp.1943–1949.

14. 2 Nevada Compiled Laws, Hillyer 1929, § 4054, Bender-Moss, 1930.

15. See Howery, loc. cit. supra, note 11, at 83, 84; 33 Cornell L.Q. 129, 131 (1947). This construction presumably underlies the position allegedly taken by the Attorney General of Nevada, stated in a letter to appellant's counsel.

16. Cf. 1 Mechem on Agency, § 126, (2d ed. 1914).

17. See 21 So.Cal.L.Rev. 206, 207 (1948); Restatement, Agency, § 17 (1933).

18. 2 Nevada Compiled Laws, Hillyer 1929, § 4054, Bender-Moss, 1930.

It has been suggested that proxy ceremonies might be more easily induced by the fraud of one of the parties,[19] or that they might be abused in an effort to evade the laws of the jurisdiction in question.[20] These comparatively remote possibilities do not alter the character of proxy marriages entered into in good faith; in the absence of such special circumstances, a proxy marriage is not inconsistent with the general marriage laws of Nevada.

Traditionally, the objection to proxy marriages has been that such marriages do not adequately protect the public interest in assurance that the consent of both parties is freely given at the time of the ceremony.[21] Possibly an absent party might desire to revoke the authority prior to the ceremony and such revocation could not be communicated until after the ceremony. Such a possibility, in light of modern developments in communication, is not sufficiently substantial to render all proxy marriages so questionable as to be at variance with the Nevada marriage laws.[22] The probability of a tardy revocation is no greater than the probability of an erroneous expression of consent induced by fraud, alcohol or duress from a party personally present.[23]

No Nevada decisions bearing on the validity of proxy marriages have been called to our attention. In the absence of Nevada authority, it is appropriate to turn for guidance to the reported cases of other jurisdictions. While proxy marriages have been upheld as common law marriages in some states,[24] and as ceremonial marriages under the marriage laws of other countries,[25] our attention has been directed to only two cases ruling on this question under the laws of American jurisdictions. In one, a proxy marriage celebrated in West Virginia was held voidable, but not void ab initio, as a ceremonial marriage under the West Virginia laws.[26] In the other, a proxy marriage celebrated in the District of Columbia was upheld as a ceremonial marriage under the laws of that District.[27]

At least one state has enacted a special statute expressly authorizing marriages of this sort during the war years.[28] In the face of these circumstances the long history of proxy marriages,[29] and the absence of an express prohibition in the Nevada laws against such marriages it cannot be said that proxy marriages are inconsistent with its marriage laws.

A comparison of the Nevada marriage laws with those of other states[30] substantiates the conclusion that proxy marriages are not inconsistent with Nevada laws, because the Nevada laws appear more easily reconcilable with the principle of proxy marriages than are those of many states. While it has been said that no state expressly requires by statute that both parties be personally present at the cere-

19. Lorenzen, op. cit. supra, note 9, at 477.

20. Cf. Cosulich Societa Triestina di Navigazione v. Elting, 2 Cir., 1933, 66 F.2d 534, 536.

21. See Lorenzen, op. cit. supra, note 9, at 477, 483; Apt (otherwise Magnus) v. Apt, supra, note 9.

22. In this case Lt. Barrons was notified of the completion of the ceremony and wrote back expressing his approval.

23. Other objections to proxy marriages, raised by the losing party in Apt (otherwise Magnus) v. Apt, supra, note 9, do not merit discussion here.

24. United States v. Layton, D.C.S.D.Fla. 1946, 68 F.Supp. 247.

25. See the cases referred to in note 11, supra.

26. Respole v. Respole, C.P.1946, Ohio Com.Pl., 70 N.E.2d 465, 170 A.L.R. 942.

27. Ferraro v. Ferraro, Family Ct., Kings Cty., 1948, 192 Misc. 484, 77 N.Y.S.2d 246; affirmed sub nom. Fernandes v. Fernandes, 1949, 275 App.Div. 777, 87 N.Y.S.2d 707. Apparently there is no provision in the laws of either West Virginia or the District of Columbia comparable to § 4050 of the Nevada statutes, expressly establishing the minimum essentials to the solemnization ceremony.

28. 31 Minn.Stat.Ann. § 517.09, West, 1947. Similar legislation was proposed, if not actually enacted, in other jurisdictions. See Howery, op. cit. supra, note 11, at 54-55.

29. See Lorenzen, op. cit. supra, note 9.

30. See generally, May, Marriage Laws and Decisions in the United States (1929).

mony,[31] as a practical matter it is unlikely that proxy marriages would be attempted in many states.[32] Some statutes appear to contemplate the personal appearance of both parties before the official issuing the license;[33] the Nevada statute expressly provides that no more than one of the parties need appear for this purpose.[34] Similarly, the statutes of some states requiring that pre-marital physical examinations be performed shortly before the ceremony by physicians duly qualified in the state of the ceremony would virtually forestall any marriage in most situations where a proxy ceremony becomes necessary. In Nevada no physical examination is required.

■ The remaining provisions of the Nevada marriage laws disclose that this proxy marriage cannot be deemed void ab initio. In those provisions, the Nevada legislature has specified the effect to be given to various types of defects in an otherwise valid marriage. Only those marriages which are bigamous or incestuous are absolutely void.[35] Other marriages tainted with defects of a more personal nature, less objectionable to the public at large, such as marriages induced by fraud, are merely voidable, and can be set aside only by bringing an appropriate action for annulment.[36] Still other less serious defects of a formal nature, such as unknown lack of authority in the presiding official, are not given the dignity of grounds for annulment.[37] If the lack of personal appearance at the ceremony can be said to be

---

31. Howery, op. cit. supra, note 11, at 58. But see 2A Gen.Stat.N.C.1950, § 51–1, requiring "The consent of a male and female person * * * presently to take each other as husband and wife, freely, seriously and plainly expressed by each in the presence of the other, and in the presence of" the presiding official.

32. See, Howery, op. cit. supra, note 11, at 64–100.

33. See, 1 Vernier, American Family Laws, §§ 17, 31 (1931).
    Some would probably be construed to require that both parties take an oath in the presence of a certain official. Rev. Code of Delaware, 1935, § 3490. The swearing of an oath is usually considered the sort of duty which cannot properly be delegated. See 1 Mechem on Agency, §§ 124, 125 (2d ed. 1914).

34. § 4053 of the Nevada Code provides in part:
    " * * * The county clerk may inquire of the party applying for marriage license upon oath or affirmation relative to the legality of such contemplated marriage, and if the clerk shall be satisfied that there is no legal impediment thereto, then he shall grant such marriage license * * *.
    "And it shall be the duty of the clerk, when issuing said license, to require the party applying therefor to answer under oath each of the questions contained in the said form of license, and if the party applying therefor cannot answer positively any questions with reference to the other party named in the license, it shall be the duty of the clerk to require both parties named in the license to appear be-

fore him * * *." Nevada Compiled Laws, § 4053, Bender-Moss, Supp.1943–1949, as amended in 1949 in respects not relevant here.

35. § 4066 provides: "All marriages which are prohibited by law on account of consanguinity between the parties, or on account of either of them having a former husband or wife then living, shall, if solemnized within this territory, be absolutely void without any decree of divorce or other legal proceedings." 2 Nevada Compiled Laws, Hillyer, 1929, § 4066, Bender-Moss, 1930.

36. § 4067 provides: "When either of the parties to a marriage, for want of age or understanding, shall be incapable of assenting thereto, or when fraud shall have been proved, and there shall have been no subsequent voluntary cohabitation of the parties, the marriage shall be void from the time its nullity shall be declared by a court of competent authority." 2 Navada Compiled Laws, Hillyer 1929, § 4067, Bender-Moss, 1930. This section was amended in 1947 in respects not relevant here. See Nevada Compiled Laws, § 4067, Bender-Moss, Supp.1943–1949.

37. § 4061 provides: "No marriage solemnized before any person professing to be a judge, justice, or minister, shall be deemed or adjudged to be void, nor shall the validity thereof be in any way affected on account of any want of jurisdiction or authority, provided it be consummated with a full belief on the part of the persons so married, or either of them, that they have been lawfully joined in marriage." 2 Nevada Compiled Laws, Hillyer 1929, § 4061, Bender-Moss, 1930.

a defect, it is certainly not of the first class. The most that could be said of it is that it rendered the marriage voidable. Since the marriage under attack here has not been annulled, and the husband is deceased,[38] appellant has no standing to attack it.

Judgment affirmed.

38. See 2 Schouler, Marriage, Divorce, Separation and Domestic Relations, § 1086 (6 ed. 1921).